Oh yeah, oh yeah, yeah, all right. Third case of the morning is very interesting. Tango Marine versus Elfin Group Limited. And we will hear from Mr. Sharif. Good morning. Hello. May it please the court. Would you mind taking your mask off so we can hear you? Oh yeah, thanks. My name is Muhammad Abash Sharif on behalf of Appellant Elfin Group. And I have with me here my associate, Adnan Ahmed, and we'll be dividing up our time amongst the two of us before this panel. The essence of this case is- Do you have any particular division you want to follow? I'm not sure we'll follow it, but let us know how you plan to divide it. So there are three issues present for the court. Personal jurisdiction, whether the default judgment was procedurally warranted, and whether it was substantively warranted. I'll be handling the personal jurisdiction, and my associate will be handling the procedural and substantive warrantness of the default judgment. And hopefully we'll both be able to answer questions in any of those areas. So the essence of this case before the panel today is whether or not it offends the traditional notions of fair play and substantial justice to drag a corporation from Nigeria all the way to Texas in connection to a transaction or an alleged contract that has nothing to do with the United States, much less the state of Texas. And on top of that, if that foreign entity has no assets in the forum, and whether or not it is fair and just to enter a default judgment for $4.5 million against the appellant when it is abundantly clear from the record that the appellant attempted to respond, if not actually responded, to the live complaint. Let me ask you about that. My turn? Sorry, Judge. Did Judge McBride ever make an affirmative finding that there was personal jurisdiction? And on what basis did he rule? Or is it just subsumed into granting of judgment? It was subsumed into granting of judgment. He entered, he denied our motion to set aside an entry of default. And— I found a memorandum of opinion of setting aside the initial default, perhaps. I'm not sure what it's on. I don't see anything in there. And then I see the final judgment. Are there other rulings? That's it. He went straight from the setting aside the, he went straight from denying our motion to set aside the entry of default to granting $4.5 million judgment. There was no memorandum or opinion that explained his reasoning for it. Okay. But is that, I mean, what I wonder, if this is under Supplemental Rule B, breach of a maritime contract, that's what the action was. And isn't the basis of jurisdiction over such an action that there is, or will soon be, property in the jurisdiction that can be used to satisfy the judgment? It's sort of like a garnishment. Correct, Your Honor. And— Well, then why do we care about personal jurisdiction when they have jurisdiction over the, I don't think you're even disputing that there's jurisdiction that Elephant has some kind of assets in the Northern District of Texas. Actually, Your Honor, we are disputing the fact of whether there are any assets in the Northern District. There's actually testimony on the record from the Executive Director, a sworn affidavit, where he explicitly states that there are no assets from Elephant Group in the Northern District of Texas, nor does he foresee any being there in the foreseeable future. And not only that, he also testifies to the fact that there is no contract between the parties. Elephant Group has never entered into a contract with— What are you arbitrating? What's your client arbitrating with TANGO about? TANGO initiated the arbitration, and it didn't go any further than that. They sent a notice of arbitration. Then they abandoned that, filed a lawsuit in Virginia. The Virginia District Court, Eastern District of Virginia, denied that, saying that they didn't plead enough specifics as to the alleged assets, which is . . . The court in the District Court of Virginia gave them ten days to amend their pleading to be more specific about it, but they abandoned that and essentially pled the same exact facts pertaining to the same exact alleged assets in the Northern District of Texas. Isn't that what . . . I mean, correct me if I'm wrong, but isn't that what classically happens if a shipping company is trying to collect on a contract? Sometimes they have to go around the world pursuing the assets of the counterparty. Correct, Your Honor, but they should at least be able to identify specifically what assets they're trying to collect, not make conclusory statements and say, upon information and belief, and drag a corporation from across the world into whichever jurisdiction they want to. And did Judge McBride make any findings about that? It seemed to me he sort of assumed that there were assets in the district. Yes, Your Honor. He essentially assumed such. Okay. May I continue? Go ahead and say whatever you want to say. Okay. So the appellee, Tango, essentially alleges two potential or speculative contacts that Elephant Group has with the Northern District of Texas. One is . . . and both of them are third-party articles online that they've quoted. One of them is a third-party quote that quotes a fourth party, which is a governor of Edo, a region in Nigeria, where he says, I intend to partner these two companies up. Not even that there is a partnership. And the other contact that they try to connect is with the company in Virginia, where apparently some of the directors are residents of Texas, but they have a wholly owned subsidiary of a media company, and they also have other local business . . . somehow they try and connect that there's sufficient enough contacts with the Northern District of Texas by making their argument. And it's clearly established that . . . it's clearly established law that minimum contacts requires for a party to essentially be at home. And in order for it to be general jurisdiction, an entity is at home when there are . . . if I may just finish my thought real quick . . . an entity is at home where it's a place of formation, principal place of business. They've conceded in their pleadings that Elephant Group is formed in Lagos, Nigeria, and conducts business out of Nigeria. And only in exceptional circumstances can there be general jurisdiction where it's not a principal place of business or formation. Well, thank you. And you've run out of time. Thank you. You have time for a vote. Mr. Ahmad. Good morning. May it please the Court. My name is Anant Ahmed. I'm an associate with Mr. Sharif. As he stated earlier, there are three reasons to vacate the District Court's judgment. One, there is no personal jurisdiction, as Mr. Sharif just explained. There's no minimum contacts, and it violated due process. I want to talk about that the District Court's judgment should be overturned because procedurally, a default judgment should not have been granted, and substantively as well. Under procedural . . . to overturn a District Court's decision based on when the procedure was not warranted, one misstep by counsel should not be the deciding factor, as decided in the U.S. Supreme Court in Conley v. Gibson. The courts have decided that the Lindsay factors are the controlling law when it comes to reversing a default judgment in the District Court level. The Lindsay factors are, one, if there's a material issue of a genuine fact, the harshness of the judgment, the grounds for default, whether the court would be obligated to set aside the default judgment, and if there's been substantial prejudice. One, there is a genuine issue of a material fact. One, as Mr. Sharif has stated, that we have an affidavit on the record indicating from the director of Elephant Group stating that there's no contract with Tango. There is no . . . They have a contract with. In other words, Tango was the, you know, charterer, perhaps, of the vessel, and the vessel had all this piledurea on it, which Elephant Group owned, or somebody owned. Is this a question of just the wrong entity in a group of entities, or what? That's exactly what, when we filed our 12B motion, one of the reasons was to failure to file against an indispensable party, and that's one of the reasons why Tango's pleadings fails Federal Rule 8. Who is the indispensable party? I'm not sure if it's in the pleadings or not, but I think it's, it starts with a T, or vertigo, or something like that. But, yeah, but that's who they are. I apologize for that. So, yeah, there is a genuine issue of a material fact, and that is a central issue in this case, whether there is a contract or not. Two, whether Tango would be prejudiced if the default judgment was vacated. They would not be. We have filed repetitive motions which indicate our position. But wasn't that the problem, as I understand it? The position is set forth in various pleadings that are filed, but they're not filed in the normal, responsive order, as I understand. I noticed you had local counsel, Mr. Elahi, if I'm not mispronouncing the name, but you had local counsel in Dallas. So, consequently, the position is caught up in a responsive pleading, but not in a pleading that there's an amended complaint. And, granted, there's some confusion on both sides, but isn't it true that there is not a pleading entitled, a motion directed to the amended complaint? Isn't that what the judge hung his hat on? Yeah, I definitely understand that point of view, Your Honor, yes. As the district court pointed out, that Tango had filed a response to our motion to dismiss after the amended complaint when they did not need to do so. And there's a local rule, though, that talks about the customary practice. I suppose it's codified in a local rule of court that says you have to file the pleading that's appropriately titled, that sets forth the position. Yes, and I agree with that, Your Honor. But also, the rules also indicate that we need to look, when we interpret federal rules and pleadings, we have to look at the merits so justice can be done. So it shouldn't be as trivial or superficial just by looking at the title. Well, I understand, and certainly the amount of the judgment in this case, or any judgment, depending on who the party is, is certainly no small matter. But it seems to me that the issue in this case is one of, with all due respect to all concerned, it's more of a lawyer miscommunication issue as opposed to a legal issue at this point. Yeah, there could be definitely miscommunication issues, also procedural issues as well. As you pointed out, a filing with the incorrect title was filed. But also, as the district court pointed out, a reply was filed, which confused the court, confused us, and us, in good faith, filed a reply to that response. Which leads us to think that our motion to dismiss was no longer moot. But I definitely understand the district court's position, but I think we did this in good faith, which is one of the Lindsay factors. So not only that there was a genuine issue of a material fact, our efforts and our actions were done in good faith. Further, they will not be prejudiced, as I just stated, that they are aware of our concerns in their amended complaint. One, they failed to join an indispensable party. Two, their pleading fails on its face because their claim for relief under Ashcroft v. Iqbal also fails. And further, the harshness of the judgment, as you just mentioned, a $4.6 million judgment over these types of errors or miscommunications or misunderstandings would be unduly harsh. Who got the money for the sale of the urea? I mean, it was held up in port, but it was eventually transported, right? Yes, Your Honor. Okay. So who got the money for it? I'm not aware of who received the money. I did not see that in the— Not your client? Not to my knowledge, Your Honor. I don't want to misspoke. Okay. And then the final Lindsay factor is whether the court would be obliged to set aside the default judgment. One, there's no personal jurisdiction. Two, since all of the Lindsay factors weigh in our favor, the court should be obligated to vacate the default judgment that was done at the district court level. After the court— and in the event the court decides that the plaintiff or appellee has satisfied the procedural requirements for a default, and we are not conceding that at all, but in the event, then the court must consider the substantive merits of a default. With that, the court must look to the pleadings. They must look within the pleadings and the merits to see if there's sufficient facts for the appellee to receive the judgment, which is the default judgment in this case. When we're looking at the pleadings, what are we looking at? We're looking at the causes of action, which are two here— breach of maritime contract and breach of maritime tort. The Fifth Circuit in In re Tash has stated that when we're dealing with maritime contract, we're going to apply general principles of contract law, which is offer, acceptance, and consideration. Here, there was no offer. There is no acceptance. There is no contract whatsoever on the record. The only thing on the record is the director of Elephant Group indicating that there's no contract and there's no property in the forum. So therefore, the breach of contract action falls. Therefore, the breach of maritime contract fails because that's the first element. Second, the second cause of action is what? Breach of maritime tort. The first element of breach of maritime tort is a duty is owed. There's no legal authority indicating that Elephant Group owed any legal duty to Tango. So therefore, procedurally, the default was an abuse of discretion and substantively was an abuse of discretion as well. I'll reserve the rest of my time for Mr. Sharif's rebuttal. Thank you. Thank you, Your Honor. All right, sir. Thank you. Mr. Simms. It pleases the court. I'm Steve Simms. I'm the counsel for Tango. And Judge Southwick, you had a question about the opinion of Judge McBride. That would be at record 21-166, starting with 493, November 24, 2020, where Judge McBride found that the default was willful and that there was a basis to not enter the default because of that. And it goes all the way back to the waiver of personal jurisdiction. And Judge Jones, you have an opinion. It was not too long ago, 1987, 8-11-F-78, Broadcast Music v. MTS Enterprises. And what the court looked at was the participation of counsel in the case before there was any, there it was a 12b-5 defense failure of service of process. No contest about that here. Elephant says, yeah, at least, that's not contested. So what happened when Elephant— Before you leave this, I mean, you referred to this opinion, which I have in my hand. What's the relevance of this November 24 opinion? Is there some holding in here about assets being in the state or in the district or about personal jurisdiction? The key finding, Your Honor, is the willful default. Judge McBride did not find that there are assets in the district. And in fact, the Garnashees came back and they said, well, we don't owe Tango anything. But here's what we do know, is that there is a contractual relationship between the Elephants and these entities. As a matter of fact, it's the most major one that there is in the U.S. And what started this out, and Judge Jones, you talked about what you have to do in a maritime case, look around the world for assets, and there, lo and behold, on the website, was this major project announced with the H-2A resident in Dallas and Shinebridge, two of its directors present in Dallas, for $6, $7, $8 million, something like that. And what we haven't heard from the Elephant side is that there's no contractual relationship. There's no business being done. Well, there is. Their website says that, says that today. So the personal jurisdiction, so what happened? The surface of process was made. The clerk in June entered default. And then nothing happened until Judge McBride said, Tango, apply for default judgment. And so there we moved on July 1st, asking for a default judgment. And on July 2nd, here comes the Elephants. And they show up. And what do they ask? Do they say, we, you should vacate the default because of lack of personal jurisdiction? 12H-2 would require them to do that as the opening filing in the case. There haven't been any pleadings in the case. There's just been filings, okay. But no, that's not what was happening. There was no personal jurisdiction issue raised. Instead, what the Elephants do is they ask for an extension of time under Rule 6. And that was the first motion that's in the underlying docket, docket number 40, July 2nd, 2020. Okay, so then what happens? Well, 21 days pass. No, there's the appearance filed, the line of appearance, but appearance with this Rule 6 motion, no mention of personal jurisdiction. And then we get to July 23rd, motion to vacate the default. In the motion to vacate the default, you won't see an argument about personal jurisdiction. It wasn't raised. 12H-2. I don't think they waived that argument, though. I don't think that the order in which you file, this is not Texas back in the old days, where you waive a special appearance by making a general appearance. Federal rules don't contemplate that. Yes, and we're not talking about Texas procedure. I know that. Of course, but what we are talking about is the participation in the case, like Your Honor was writing in the BMI case, before the idea of personal jurisdiction comes up. And that's the waiver basis. Now, on the side, this was a Rule B case, is a Rule B case. It's also a personal jurisdiction case. So, had there been property attached, if there was no Rule C-8 restriction, then that would have been a waiver under the Sembawang case also. But what we have is a direct case here, since there was no property attached against the elephants, and— Getting back to your timeline, you've described the first two pleadings that they have filed, that the opponent has filed. One was the motion for extension. Yes. And the other was to set aside the default. Do you contend that either one of those waive jurisdiction in and of itself? Yes, because, Your Honor, under 12H, the first thing filed had to be a personal jurisdiction objection. Let's say, for example, they were objecting to service of process, okay? Well, that would have been clearly a waiver. They would have shown up. They would have appeared. And that was the waiver here. And so then we fast forward to what happened next. So Judge McBride says, okay, we'll give you a buy on this one. You can come in and file your responsive pleading, okay? And so that's what happens. Then what Tango does, we look at the responsive pleading, and we say, okay, we can fix that. Pleading is Rule 12. It's a Rule 12 motion. Theirs is a Rule 12 motion, yes. In that motion, do they have any reference to the personal jurisdiction? Yes, sir, they do. And so our response was they waived it. And then what Tango did, looking at the claimed deficiencies, personal jurisdiction and maritime jurisdiction and maritime contract and those sorts of things, we came back, Rule 15, we amended and dealt with every single one of those questions. Then the proper response was you file a Rule 12 motion against the amended complaint. Or you answer the amended complaint. But that's not what happened. Instead, what happened... You also filed, as I understand the record, maybe I'm wrong, wasn't there also filed in opposition to the existing Rule 12, the first Rule 12 motion? Yes, Your Honor. If the... It would seem to me that, and I agree with you, the amended complaint would normally address what's been raised in the Rule 12 motion, hopefully successfully, so that you can get on with the litigation. But at that point, there's no communication to clarify that, oh, by the way, your Rule 12 motion is moot. If you'd like to file another, you need to file it in connection with the amended complaint or anything that would clarify the fact that the amended complaint would then moot out the existing Rule 12 motion, the court would no longer consider the Rule 12 motion, but instead you file in opposition to a motion that you now perceive of as being moot. And our lead in the response was we filed an amended complaint, answers everything, we don't have to go further. But for some reason, if you think we do, we're still fine. Okay. That's what we said. That's the belt and suspenders. And so that's what we did. So right up front, what Tango said was we've got an amended complaint. You need to respond. So you think that after the first experience with the default and having to vacate a default and having to pay our attorney's fees for having to vacate the default as a condition, that once the default was entered, the first part of October, that something would have happened. Nothing happened. There wasn't a motion to vacate that default made until the end of the month. And then Judge McBride looked at what happened. Now, we've got two standards running here. We have clearly erroneous on the finding of willfulness. And then we have abuse of discretion. Okay. So there was a comment about these Leslie factors. The court also, as looking through those factors, has the ability and the empowerment to— Where was that case even—where were those factors even cited at the district court? They were not. They were not. That's why I figured—because he didn't—he didn't—nothing in his ruling suggests that he found anything other than willfulness. And he said they were willful because they filed the wrong pleading and they deliberately said they were filing the wrong pleading. Yes. Yes, Your Honor. And then the— Is it not automatically an abuse of discretion if you didn't apply the Lindsay factors? No. No, Your Honor. It isn't. Because once the court finds the default is willful under—I think the case's name is Englehart. That's what's sticking in my brain anyhow. The—that ends the question. And then—so stop one. Was the finding of willfulness of the default clearly erroneous? Okay. Was there no possible way that the—that there was anything but a willful default? Okay. And so Judge McBride looks back at what happened. Certainly everybody's on notice of the consequences of the default. The default entered October 1st. Nothing happens. Wait to the end of the month. Raise the same arguments as has been raised before. Don't raise any meritorious defense. And that was in Judge McBride's opinion. Just, well, it might be. Probably isn't a maritime tort. Doesn't sound like one. Well, we don't think there's a maritime contract here. That's not a meritorious defense. And so Judge McBride puts this together and says it was a willful default. This is three strikes or two strikes, you're out. So then, after having found willful default, then the next step is abuse of discretion. Did the court abuse its discretion finding that there was a basis for not vacating the default and then moving forward? Now, as we went to the default judgment phase, there was no attempt to take discovery on the damages. No question about the damages. No request to take discovery on the damages. So those pretty much went in straight away. And so then we get up to the entry of the default judgment. Now, at that point, what the elephant side could have done, of course, was to bring a Rule 60 motion. And it's a pretty recent case, Shelley v. DeRiso, 982, Fed 3rd, 403. The court says, no, you don't have to do that in order to— Right. Yeah, but it would have been nice because it could have clarified things. And essentially, what the elephants are doing is making a Rule 60 argument without having made a Rule 60 motion. They're saying, you know, it's a bad result. There was no personal jurisdiction. There was error. There was excusable neglect, those sorts of things, but no Rule 60 motion. Well, was there— Let me just ask you, though, you know, it's unusual to see a default judgment where there may be a serious question about personal jurisdiction. If the question were a serious question, and, again, the elephants, having announced this huge contract, have never said, we don't have a contract. Just being a party to a contract in a certain jurisdiction is not alone enough for a specific jurisdiction. Isn't that correct? For general jurisdiction, it is. Yeah. And that's what we're—that's what we're aiming at here. But, I mean, you're not suing on that contract. You're suing on the demerge and that aspect of it. General jurisdiction based on the business that the elephants are doing in the Northern District of Texas with these two entities, which are their major U.S. trading partner, that's the basis of general jurisdiction here. And so there is—and there's—of course, I know you're always aware of this question because it's come up in the Durell case, which just got voted to be heard in bank. And we're not talking about a 4K question here. Elephants aren't all over the country. They're just in the Northern District of Texas. But that's where they are. And there is sufficient context, not denied—again, we're back to the default, back to the And the default is established—has established those facts. And the court, of course, goes by the facts that are alleged. The elephants at this point can't attack the facts. What they did have to come back with is to show a meritorious defense. And as Judge McBride pointed out, that wasn't done either. And so the court should sustain the judgment. Okay. Thank you. We have your argument. Mr. Sheriff. Thank you, Your Honor. So I have a lot to cover. So one of the questions that opposing counsel conceded to is the fact that Judge McBride did not actually apply all the factors, all the leniency factors. What he did essentially was consider our mistake to be willful and therefore said that Elephant Group needs to pay $4.5 million. If we're going back to the record a little bit, counsel hounded a bit on the repeatedness of late—lateness of filings, things of that nature. If you recall, the default was in June. March, April, and June—the original default, March, April, and June were when COVID was rapidly—COVID-19 was rapidly expanding across the United States. And if it was that bad and the United States were to essentially shut the country down, it was 10, 20 times worse than Nigeria. And for a company in Nigeria who has no access to lawyers and doesn't know how to obtain legal counsel, it's going to take them a bit more time. And— Well, I mean— I mean, is that ever cited as a reason for a delay, or are you telling us that today? No, it was cited for a reason for a delay when we moved to set aside the initial default entry. Well, that's fine, but their pleading says that Elfin Group is one of the largest companies in Nigeria. It's an international company. It imports a lot, but it basically does agriculture within Nigeria, right? I understand that, but they're not farmers tilling the soil. They're big-time merchants. Sure. I can concede that, but at the same time— Just saying, you said they didn't have access to lawyers. Well, you know, they have cell phones. They had access to lawyers. And I'm not—nobody's questioning the setting aside of the first default anyway. Okay. So, as far as waiver, opposing counsel states that our motion for leave to file a response, our motion to vacate, those were a waiver of personal jurisdiction, but as—and he cites to Rule 12H. Rule 12HA2 actually states that it's a waiver if it's not part of a motion or a responsive pleading. Neither of those motions were responsive pleadings. A responsive pleading would have been an answer. A—the very first responsive—we haven't even actually filed an answer in this case yet because all we've done is filed Rule 12B motions. And so, technically, we could still file a Rule 12B motion because there has been no answer filed. And as far as—as far as counsel stating that it took a month to file a—to move to set aside the default entry. When we filed a response—when we filed a reply to their response to the motion to set—the response to our motion, Rule 12 motion, to dismiss, my understanding—and I was the counsel that was handling that—my understanding was that I needed to respond to the amended complaint. But after filing the amended complaint, counsel filed a response to the original Rule 12B motion arguing why the Rule 12—why the amended complaint cured all of the issues in the original Rule 12B motion and why the original Rule 12B motion should be denied. As if the original motion was still alive. And so, I was left with the option of either ignoring the Rule 12B—the response where he argues why our motion to dismiss should be denied or file a duplicate— It's not an option. It's—I mean, he mentioned the term belt and suspenders. You could have responded in the interest of being complete to the first motion if it were still active and also filed a new Rule 12 pleading based upon the amended complaint. And so, Your Honor, to that, Rule 12, I think, G, states that there shouldn't be successive motions. And that—and the purpose for that is because you want there to be efficiency. You don't want someone filing a Rule 12-5 motion, that getting ruled on, and then filing a Rule 12, you know, 6 motion, for example. And so, in our reply to their response, we specifically prayed for that all the causes of actions and claims in the amended complaint be dismissed pursuant to Rule 12B motions. It wasn't that we were still addressing the original complaint. We were explicitly addressing the amended complaint in our reply. And as far as why we didn't file a response or another Rule 12B when the default entry was entered is because as soon as they filed a motion for entry of default, within two of that reply stating that, hey, we've already filed a document that addresses the amended complaint. Okay. Well, your red light has been showing for a little while. That's okay. We appreciate that, your argument, and the Court will stand in recess until 9 o'clock tomorrow morning. Thank you, Your Honor. Thank you.